Samuel W. Meisel and Rose M. Meisel v. Commissioner.
Meisel v. Commissioner
Docket No. 411-66.
United States Tax Court
T.C. Memo 1969-31; 1969 Tax Ct. Memo LEXIS 264; 28 T.C.M. (CCH) 141; T.C.M. (RIA) 69031; February 13, 1969, Filed Herbert W. Mintz, for the petitioners. Paul H. Frankel, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined a deficiency of $42,417.18 in the petitioners' 1960 income tax. Certain issues have been conceded by the parties. The principal question remaining is whether a certain transfer of stock represented a bona fide sale on the installment basis. If that question is answered in the affirmative, there is a further issue as to whether certain payments to the transferor were loans or the proceeds from the disposition of installment obligations. Irrespective of the answer to the principal question, there is an additional issue as to whether certain payments with respect to these "loans" constituted deductible interest. Findings *265 of Fact Some of the facts are stipulated and are found accordingly. Petitioners (hereinafter referred to individually as Samuel or Rose) are husband and wife who had their legal residence in New York, New York, at the time of filing the petition herein. They filed a cash basis joint Federal income tax return for the taxable year 1960 with the district 142 director of internal revenue, Manhattan, New York. Eleanor M. Howard (hereinafter Eleanor) is the petitioners' daughter. Samuel has been a stockbroker since 1952 and has managed financial matters on behalf of Rose and Eleanor. Samuel arranged the intrafamily transactions in question; Rose and Eleanor participated only to the extent of signing papers at Samuel's request. S.W. Meisel Realty Corporation (hereinafter Realty) was a real estate corporation whose only significant asset was real property at Empire Boulevard and Bedford Avenue, Brooklyn, New York. It had owned this property since prior to 1952. Since the early 1950's, Eleanor owned an adjoining parcel of land at Bedford Avenue and Sullivan Place. At least until January 6, 1960, Rose owned Realty's one share of stock, constituting all of its issued and outstanding *266 stock, which she acquired in December 1945 for $5,000. On February 16, 1959, Realty adopted a plan of liquidation pursuant to section 337, Internal Revenue Code of 1954. On February 19, 1959, Realty and Eleanor entered into contracts for the sale of their adjoining properties to one Emanuel Lurio. Under this contract, the purchase price for the Realty property was $140,625, of which $100,000 was to be in the form of a 15-year purchase money mortgage. Because of difficulties in obtaining a zoning variance, these contracts were terminated in October 1959. At that time and until it was satisfied by a payment by Eleanor in December 1960, an architect's fee of $4,000 was unpaid and constituted a potential lien on the properties. On October 28, 1959, subsequent to the termination of the Lurio contracts, Realty entered into a Land Purchase Option Agreement with Esso Standard Oil Company (hereinafter Esso), which gave Esso an option to purchase Realty's property for $200,000, with a credit of the $1,500 paid for the option. Esso exercised this option on December 31, 1959 and paid Realty an additional $19,000 toward the purchase price. On January 6, 1960, Rose *267 transferred her Realty stock to Eleanor for $168,000. Eleanor agreed to pay $5,000 in 1960, and executed a series of ten $16,300 notes, bearing interest at 4 1/2 percent per annum, with one note due on each anniversary of the stock transfer for ten years. All notes maturing by the date of trial, together with the purported interest thereon, were paid. The closing of the sale of Realty's property to Esso was held on January 28, 1960. One hundred seventy-nine thousand, ninety-eight dollars and seventy four cents was paid in cash which, together with prior payments plus credits for taxes, water, and sewer aggregating $20,901.26, constituted the total purchase price of $200,000. Realty was dissolved on January 29, 1960 and $170,518 was distributed to Eleanor on that date. Eleanor made seven purported loans in varying amounts from $9,500 to $57,500 to Rose between February 1 and August 1, 1960, which totaled $171,500 and bore interest at the rate of 6 percent per annum. By January 12, 1968, these purported loans, together with the purported interest thereon, had been paid. Ultimate Findings of Fact The transfer of Realty stock from Rose to Eleanor was not a bona fide sale. *268 The purported loans from Eleanor to Rose did not constitute a bona fide indebtedness, with the result that the purported payments for the use of the proceeds thereof were not interest. Opinion The principal issue to be resolved herein is whether the transfer of the Realty stock by Rose to Eleanor on January 6, 1960 was a bona fide sale. As our findings of fact reflect, we conclude that it was not. We see no need to detail the analysis of the evidence which underlies our conclusion. The various transactions were constructed with an obviously meticulous attention to detail. The elements which point in this direction are: (a) the variations among the amount distributed in liquidation of Realty ($170,518), the amount which Eleanor agreed to pay on the transfer of Realty stock ($168,000), and the amounts transferred by Eleanor to Rose ($171,500); (b) the differences in interest rate, 4 1/2 percent on the notes from Eleanor to Rose and 6 percent on the notes from Rose to Eleanor; and (c) the differences in times of payment by Eleanor to Rose and vice versa. Against these elements are the equally obvious elements 143 that the amounts are substantially the same, that an amount slightly *269 in excess of the proceeds of liquidation was funnelled into Rose's hands within approximately six months after Eleanor received the proceeds of liquidation, and that neither Eleanor nor Rose had any real knowledge of what was involved in the transactions between them. We were totally unimpressed by Samuel's efforts to construct a plausible explanation for the intra-family shuffling of funds. To be suse, there was some evidence of past borrowings by members of the family, but there was no evidence that Eleanor ever loaned significant, if any, amounts to Rose. The claim that the transfer of the Realty stock was designed to achieve a desired ownership of both parcels of property by Eleanor, principally because of prolonged absences from New York by Samuel and Rose, has a decidedly hollow ring; the family had owned both parcels and Samuel testified that he and his wife had been away from New York for six months of each year for 12 years prior to 1960. Likewise, the claim that the potential $4,000 lien was a substantial obstacle to a closing of the Esso sale, even if it has any bearing on the issue before us, is belied by the fact that the sale closed almost a year before the item was *270 paid. Moreover, we find it hard to believe that an item of $4,000 could possibly have caused Realty to allow the Esso deal to be cancelled, when we compare the much more favorable terms of that deal ($200,000, all cash) with that of the Lurio contract ($140,625, of which $100,000 was to be a mortgage). Finally, Samuel's claim that there was a substantial possibility that the Esso sale would not close is inconsistent with his claim that he was attempting, by the transactions between Eleanor and Rose, to establish a nest egg for his daughter. If that possibility was real, it made no sense to impose on Eleanor an obligation of $16,300 per year when the property appeared to have a potential rental income of only slightly in excess of this amount. We find nothing in the record before us which breathed life into petitioners' carefully conceived plan to minimize taxes. It had a stillbirth. Since we have determined that the transfer of the Realty stock from Rose to Eleanor was without substance, we need not consider whether the purported loans from Eleanor to Rose represented advance repayments of installment obligations. We do hold, however, and we have so found, that such purported loans *271 did not constitute bona fide indebtedness, with the result that the so-called interest payments are not an allowable deduction. Decision will be entered under Rule 50.